The counsel for the appellee, presented the following petition for a rc-hcaring.

With great deference to the court, the counsel for defendant, - solicit a re-consideration of this case; and sensible how inexpedient it is to trouble the court with tedious argument, will briefly touch some of the most prominent points of the evidence.
This was a bill by W. Voorhies, to obtain a decree for the amount of a note executed by Samuel Arnold to P. G. Voorhies, and which L. Batchelor, whom the court call W. Voorhies’ agent lost. If Batchelor had any agency, he was acting for the administratrix, and to prevent her being sued; and he states his friendship to her and family as the motive of his presenting the note. The doubts relative to the note, as appears, grew out of the want of knowledge, that such a debt existed. What •madness to suppose the wife would know of such debt due by the husband. Stress is laid on Arnold’s solvency. He might have been solvent, but the fact of his signature being attached to a variety of replevin bonds, in a magistrate’s office, proves that he was embarrassed and oppressed.
Jacob Swigert swears, that Scott Brown, the agent and father of Mrs. Arnold, the administratrix, having doubts as to the genuineness of this note, came to his office in company with another individual, to compare the signature to said note, with Samuel Arnold’s signature, to several replevin bonds, and that upon comparison they (that is, he, Scott Brown, Jacob Swigert, and the third individual) were of opinion the note from Arnold to Voorhies was genuine-, and not “that it bore a striking resemblance to Samuel Arnold’s hand writing,” as the court seem to suppose; but they all three were of opinion, that the note from Arnold to Voorhies was genuine.
L. Batchelor swears, that in 1823, W. Voorhies had in his possession this note, and was about to commence suit on it, against Arnold's representatives, and he, to prevent his personal friends, Mrs. Arnold and Scott Brown, her father, from being sued, took upon himself the friendly agency of obtaining possession of the note, and carrying it into the country, to the residence of Mrs. Arnold, and that there again Scott Brown, her father, was present. He says, when he *510 first presented the note, Mrs. Arnold and Scott Brown, her agent, and father seemed surprised to see this note, and stated ulhcy thought it had been settled in some way.'1'1 That he, Batchelor, Mrs. Arnold, the ad-ministratrix, and Scott Brown, spent an hour or two in the examination of signatures and papers, and the conclusion he thinks vras, that the signature was genuine. And he understood it to be conceded by all present, that the signature toas genuine.
L. Batchelor swears, that as to himself, he has frequently seen Samuel Arnold sign his name, and believes the signature to the above mentioned note to he genuine. lie swears he never had any interest or agency in the business, except what arose from his anxiety to serve Mrs. • Arnold and her agent and father, Scott Brown, and to prevent them being sued on this note, as they were his personal friends. Thus far all is well. The note is not yet lost.
L. Batchelor swears he has frequently seen Samuel Arnold sign his name, and believes his signature to the above mentioned note to be genuine. Jacob Swigert, on comparison of the signature with replevin bonds, executed by Arnold, is of opinion the note is genuine; of the same opinion is Scott Brown; so thinks the third indivdual, who was in company with Swigert, and Scott Brown, on their examination of the note. Even Mrs.. Arnold, the administratrix, (after an examination of an hour or two) comes to the same conclusion, that the note is genuine. L. Batchelor swears he understood it to be conceded by all, that the signature was genuine. Scott Brown had then,""Oft two distinct occasions acknowledged the signature to be genuine, once in company with Jacob Swigert, and a third individual, and. secondly, in company withL. Batchelor and Mrs.. Arnold, the administratrix, at her residence.
Thus clear and settled is the business at this period,, before Batchelor has lost the note. Unfortunately for-Yoorhies, the lapse of a day or two, and the loss of the note, and Scott Brown and the administratrix have lost their minds, have lost all recollection of their repeated admissions of the genuineness of the note; although their admissions are established by the oatbs of Swi-gert and Batchelor. Sed, lísic témpora mutantur, el nos mutamur cum illis.'”
*511 The note is now lost, and the possibility of proving it directly by its exhibition, is gone lb rever. And now, for the jirel time, Scott Brown and the administratrix believe, or say they believe and adhere to that belief, that Samuel Arnold not only never executed this note, but that he paid it off shortly after its execution, by hiring a negro man Lewis, to B. G. Voorhies, in 1816 or ’17, as they attempt to prove. Strange and palpable paradox. First, that the note never was executed by Samuel Arnold; and secondly, that that very identical note, which never was executed, was paid off in 1816 or ’17. One of these propositions is clearly false. And yet, the evidence of this clan of relations (iftrue) conduces to establish both of them. First, Samuel Shannon, (the brother-in-law of Samuel Arnold) recollecting that the note was dated and due in 1817, says, “about 1816 or ’17, Samuel Arnold told him, he had hired a negro man named Lewis, to P. G. Voorhies. Immediately afterwards, this same Samuel Shannon, in a subsequent part of his deposition, speaking of the time when Samuel Arnold told him he had hired Lewis to P. G. Voorhies, (but with his attention drawn from the date of the note,) says, “I believe it was some time before Samuel Arnold was marriedf that we had this conversation in which he told me he had hired Lewis to P. G. Voorhies. Now Mrs. Arnold, the adminis-tratrix, in her answer, says she was married to Samuel Arnold in June, 1816. So it must have been some time previous to June, 1816, that Samuel Arnold told his brother-in-law, Shannon, that he had hired Lewis to P. G. Voorhies.
If we suppose this conversation to have taken place only three months (for the witness says it took place some time) before Arnold was married, then, according to Shannon’s own deposition, it must have been as far back as March, 1816; just one year before this note was executed, which purported on its face to be for money loaned from Voorhies to Arnold. Again, Scott Brown inhis second deposition, speaking with one eye on the date of the note (to-wit, 1817,) and the other on the proper means of discharging it, says, “that in 1816 or ’17, to the best of my knowledge, Samuel Arnold did hire Lewis to P. G. Voorhies.” But in a subsequent part of his deposition he says, “Lewis was hired to P. G. Voor- *512 hies, and was there (at Voorhies’) better than three of four months, perhaps one or two years before Arnold was married. Thus it appears, (keeping in mind that Arnold was married in June, 1816) from Scott Brown himself, that Lewis was at Voorhic’s in March, 1816 ’15 or ’14, that is, one year at least, and perhaps two or three years before this note was executed. Such wide swearing; such a palpable and lame effort by Shannon and Scott Brown to spread the services of Lewis over both the years 1816 and ’17, and thus cover the date of the note and extinguish it, by rendering it doubtful in which year the services was rendered, should cause the court to receive the evidence of this phalanx of relations with the most vigilant circumspection.
Neither the penetrative eye of the greatest masters of human nature, nor the pure vision of the most enlightened chancellor, is at all limes capable of perceiving much less dissevering the links in the chain of affections which bind relations together, and would drag from their fellow-men their dearest rights.
As to the neighborhood of the parties, it seems P. G. Voorhies, the obligee in the note, moved from this state some time previous to the death of Samuel Arnold, which was in 18:21. P. G. Voorhies could then only have remained two or three years, if that long, in this state, after the execution of the note. There is no proof that he assigned it to W. Voorhies. previous to his departure, and it would be unjust to presume that fact to defeat a solemn written obligation. And if such previous assignment should be presumed, there is no. proof whatever, that W. Voorhies, the assignee, was ever in this state before the year 1823, when this suit was instituted. It would seem more reasonable, from the statement in the administratrix’s answer, “that he was and is in his fathers employ,” to presume he was with his father in another state. And indeed the motion for security for costs made in this case and sustained by the inferior court, seem conclusive of the fact of W. Voorhies’ non-residcncc.
As to the lapse of time, we do earnestly and confidently hope this will have no weight against our client.
According to the deposition of Scott Brown, P. G. Voorhies moved from this state some time before 1821, *513 that is almost two or three years after the 'execution of this note, and from the answer of the administratrix, W. Voorhies was, and is now in^the employ of his father. iSamuel Arnold died in 1821, and in the mer of 1823, only about twelve or eighteen months perhaps less, after the time, when suit by law could be instituted against the administratrix, we see W. Voor-hies, anon-resident., endeavoring to collect this debt from the administratrix, in the centre and capita] of our state. Should such diligence create a presumption, that this note had been paid? Here is not twenty nor •eighteen years delay in sueing the administratrix, but eighteen months at most, and only about five years and six months from the Original execution of the note, within which suit by law could have been instituted against any person whatever.
Thus, to narrozo down a solemn written obligation or ■bond to the limitation of a vague parol contract, would seem to endanger all written securities in the land. As to the absence of direct proof of the execution of the note, we conceive that should have but little consequence attached to it. How often is it, that a common promissory note has a subscribing witness? Not one in a hundred we venture to affirm has. Such notes are commonly executed privately, and especially, when for money loaned as in this case, none present save the oh--ligor and obligee. There are many reasons .for this general practice. .Most-men do not wish the extent of their indebtedness published to the world. How hard then, and unjust would the requisition of direct proof be in the great majority of cases. Proof of execution however at most, is only proof, that the signature is genuine, or that tbe signature is that of the obligor, and such we conceive, we have clearly shown.
After the second deposition of Srott Brown is rejected, as it must be, (being retaken without leave) there is no evidence of the insolvency of P. G. Voorhies, save the statement in the answer of the administratrix, “that he was much embarrassed.” And who, we may ask, 'was not greatly streightened in their pecuniary affairs, in ’18, ’19 and ’20. But from that universal oppression, sprung a spirit of liberality and indulgence, hitherto unknown in any country. All wished indulgence themselves. Consistency, as well as that charity and *514 sympathy, which our own sufferings and misfortunes generate in our bosoms for those of others, covered the land with the mantle of charity and general indulgence.
Response to the petition.
We conceive W. Yoorhies never offered to sell the note for one fourth of its nominal value. That is the sheer supposition of Batchelor, and is no evidence we conceive, and seems to us a most groundless imagination in Batchelor. So far from offering to sell the note at one fourth of its value, we humbly conceive Yoorhies’ ■declaration is simply “that he would take $‘75 for the note,” that is to say, he would make the ordinary discount in selling such paper, particulary to usurers, and it would seem unjust and illiberal by mere presumption^ first to invert not only' the meaning of his simple declaration, but also the very words of his expression; and secondly, and by a second presumption based on the first, to stain his character with the imputation that he had forged the note, or at least sold a forgery.